SAMUEL INSULL, JR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MARGARET A. INSULL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SAMUEL INSULL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 68001–68003, 68503–68505.   Promulgated February 14, 1935.

*Laurence Graves, Esq.*, and *E. J. Quinn, Esq.*, for the petitioners.
*Allin H. Pierce, Esq.*, and *Irving M. Tuller, Esq.*, for the respondent.

### OPINION.

SMITH: These proceedings, consolidated for hearing, involve income tax deficiencies as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Samuel Insull | 68503 | 1929 | $19,947.34 |
| Do | 68003 | 1930 | 156,951.05 |
| Margaret A. Insull | 68504 | 1929 | 40.92 |
| Do | 68002 | 1930 | 17,239.34 |
| Samuel Insull, Jr | 68505 | 1929 | 3,323.04 |
| Do | 68001 | 1930 | 23,549.80 |

The petitions filed for the year 1929 raise but one issue and that is whether capital net gains realized by each of the petitioners should be excluded from net income in computing the 15 percent deduction allowable for charitable contributions under section 23 (n) of the Revenue Act of 1928.

For the year 1930, the question of the treatment of capital net gains in computing the deduction for charitable contributions is raised in the appeals of Samuel Insull and Samuel Insull, Jr. Otherwise the issues raised by the petitions filed for the year 1930 are the same in the case of each of the petitioners. They are:

(1) The determination by the respondent that the profits realized by the petitioners from the sale of shares of stock of Insull Utility Investments, Inc., acquired through the exercise of rights to subscribe for such shares should be taxed as ordinary gain or profit rather than as capital net gain.

(2) The determination by the respondent that the profit realized from the sale or exchange of stock subscription rights received on stock acquired by the exercise of stock subscription rights should be taxed as ordinary gain or profit rather than as capital net gain.

(3) The determination by the respondent that no portion of the basis of the stock with respect to which stock subscription rights were received and sold or exchanged on September 13, 1930, may be allocated against the sales price in determining the gain or profit realized from the sale.

By amended answers filed at the hearing of these proceedings the respondent alleged that he had erred in his determination of the deficiencies as follows:

(a) In determining that the transaction by which the three petitioners and a fourth individual had exchanged in January, 1929, certain securities owned by them for shares of stock of Insull Utility Investments, Inc., was a nontaxable exchange.

(b) In determining that a portion of the profit realized from the sale of stock subscription rights issued on stock of the Insull Utility Investments, Inc., received in exchange for securities transferred to said corporation, should be treated as capital net gain.

The petitioners and one Martin J. Insull were the owners of substantial blocks of stocks of public utility companies operating in the city of Chicago and its immediate vicinity. They also owned a large amount of stock in Middle West Utilities Co., a public utility holding company. It was decided that their stockholdings should be placed in a corporation. Plans for the formation of such a corporation and the transfer of the petitioners' stock interests thereto were discussed in the summer of 1928 and they assumed active form in October 1928. In that month Waldo F. Tobey began work on the organization of a corporation which thereafter became Insull Utility Investments, Inc. The entire plan of organization was worked out by Samuel Insull, Waldo F. Tobey, who handled the legal side of the

transaction, and H. L. Stuart of Halsey, Stuart & Co., who handled the financial side of the transaction. The plan contemplated the issuance by the proposed corporation of common stock, preferred stock, first series, prior preferred stock, and debentures. The plan also contemplated the method of issuance and disposal of such securities. An informal agreement was made between the petitioners and H. L. Stuart for the purchase of the debentures and the prior preferred stock by Halsey, Stuart & Co., and for the delivery of 57,000 shares of common stock of Insull Utility Investments, Inc., to Halsey, Stuart & Co. by members of the Insull family, composed of the petitioners herein and Martin J. Insull, as consideration for the services of Halsey, Stuart & Co.

Under date of December 27, 1928, a charter for the new corporation, Insull Utility Investments, Inc., was obtained under the laws of the State of Illinois. It had an authorized capital stock consisting of 250,000 shares of prior preferred, 250,000 shares of preferred, first series, and 3,000,000 shares of common stock without par value. After the incorporation a meeting of the board of directors was held on January 4, 1929. On the same date Insull Utility Investments, Inc., executed four separate agreements with Samuel Insull, Samuel Insull, Jr., Margaret A. Insull, and Martin J. Insull. By the terms of these agreements the petitioners received stock of Insull Utility Investments, Inc., as consideration for securities transferred to that company by them and they on their part agreed to deliver to Halsey, Stuart & Co. an aggregate of 57,000 shares of the common stock of Insull Utility Investments, Inc., which they were to receive in the transaction.

A condensed statement with respect to the securities transferred on January 4, 1929, to Insull Utility Investments, Inc., by the petitioners showing the stock received by each of the petitioners in accordance with the foregoing agreement, the original cost to. the petitioners, and the values at which the same were placed upon the books of the corporation, is as follows:

*Samuel Insull*

| Securities | Number of shares | Cost | Value placed thereon by Insull Utility Investments, Inc. |
|---|---|---|---|
| Middle West Utilities Co. 6% preferred | 8,909.6 | $70,520.00 | $926,598.40 |
| Middle West Utilities Co. common | 20,284 | 1,336,724.56 | 3,488,770.04 |
| Insull, Son & Co. | 350 | No cost | 437,500.00 |
| Peoples Gas, Light & Coke Co. | 6,090 | 527,728.05 | 1,315,440.00 |
| Midland Utilities Co. Class "A" preferred | 472 | No cost | 46,492.00 |
| Total | | | 6,214,800.44 |

On January 11, 1929, in return for the foregoing securities, Samuel Insull received 25,456 shares of preferred stock, first series, of Insull Utility Investments, Inc., without par value, at an agreed exchange value of $100 per share; and 486,176 shares of common stock, also without par value, at an agreed exchange value of $7.547 per share.

*Samuel Insull, Jr.*

| Securities | Number of shares | Cost | Value placed thereon by Insull Utility Investments, Inc |
|---|---|---|---|
| Middle West Utilities Co. 6-percent preferred | 6, 016 | $51, 000. 00 | $625, 664. 00 |
| Middle West Utilities Co. common | 2, 961 | 155, 930. 10 | 509, 262. 39 |
| Insull, Son & Co | 250 | 13, 750. 00 | 312, 500. 00 |
| Total | | 220, 680. 10 | 1, 447, 426. 39 |

On January 11, 1929, in return for the foregoing securities, Samuel Insull, Jr., received 5,928 shares of preferred stock, first series, of Insull Utility Investments, Inc., without par value, at an agreed exchange value of $100 per share, and also 113,241 shares of common stock, also without par value, at an agreed exchange value of $7.547 per share.

*Margaret Insull*

| Securities | Number of shares | Cost | Value placed thereon by Insull Utility Investments, Inc. |
|---|---|---|---|
| Middle West Utilities Co. 6 percent preferred | 3, 400 | $23, 000. 00 | $353, 600. 00 |
| Middle West Utilities Co. common | 1, 729 | 108, 277. 78 | 297, 370. 71 |
| Insull, Son & Co | 200 | No cost | 250, 000. 00 |
| Total | | | 900, 970. 71 |

On January 11, 1929, in return for the foregoing securities, Margaret Insull received 3,692 shares of preferred stock, first series, of Insull Utility Investments, Inc., without par value, at an agreed exchange value of $100 per share, and also 70,461 shares of common stock, also without par value, at an agreed exchange value of $7.547 per share.

On January 17, 1929, Insull Utility Investments, Inc., executed a joint agreement with the petitioners herein and Martin J. Insull by the terms of which each of these parties was given an option to purchase within two years five shares of the common stock of the corporation at $15 per share for each share of preferred stock, first series. These options had no value at the time received by the petitioners.

On January 18, 1929, Insull Utility Investments, Inc., executed a written agreement with Halsey, Stuart & Co. whereby the former agreed to sell and the latter agreed to purchase $6,000,000 of its 5 percent gold debentures, series A, and 60,000 shares of the $5.50 prior preferred stock. The debentures and prior preferred stock were delivered to Halsey, Stuart & Co. on the same date, January 18, 1929,

and the consideration was likewise received by Insull Utility Investments, Inc., on that date. Also on the same date, January 18, 1929, Halsey, Stuart & Co. sold the prior preferred stock to the Utility Securities Co., which proceeded to sell the same to the public; Halsey, Stuart & Co. sold the debentures to the public. Both the debentures and the prior preferred stock carried nondetachable warrants for common stock at $15 per share before June 30, 1929. Because of the quick rise in prices of the common stock many of these warrants were exercised by the holders of the debentures and prior preferred stock who had bought their securities from the distributors.

The foregoing transactions with Halsey, Stuart & Co. were entered in the journal of Insull Utility Investments, Inc., as of January 17, 1929, and the accrued interest on the debentures and the accrued dividends on the prior preferred stock were adjusted to show transfer of said securities as of that date. The common stock which was delivered to Halsey, Stuart & Co. for its services in accordance with the agreements of January 4, 1929, actually was delivered to Halsey, Stuart & Co. by the petitioners herein on January 21, 1929.

All of the foregoing transactions were carried out in accordance with the general plan of procedure which was determined and agreed upon as aforesaid prior to the organization of Insull Utility Investments, Inc., in December 1928. All of the written agreements above described and referred to were prepared in the office of Waldo F. Tobey at or about the same time to reflect the general plan of procedure agreed upon. They were dated on the respective dates when they were fully executed by the parties thereto.

On December 17, 1929, a 6 percent stock dividend was declared by Insull Utility Investments, Inc., on its common stock, payable 1½ percent on January 15, 1930, 1½ percent on April 15, 1930, 1½ percent on July 15, 1930, and 1½ percent on October 15, 1930, to the stockholders of record on December 31, 1929, March 31, 1930, June 30, 1930, and September 30, 1930.

On December 31, 1929, Samuel Insull exercised a portion of the option acquired by him and thereby purchased 126,030 shares of common stock of Insull Utility Investments, Inc., at $15 per share. On the same date Margaret A. Insull and Samuel Insull, Jr., exercised the options which they had acquired and thereby purchased common stock in the amounts of 18,460 shares and 29,640 shares, respectively.

On December 31, 1929, the common capital stock of Insull Utility Investments, Inc., was traded in on the Chicago Stock Exchange at the following prices:

| | |
|---|---|
| High | 58¾ per share |
| Low | 57½ per share |
| Closing | 58¾ per share |

The sales on that day on the Chicago Stock Exchange amounted to 8,200 shares. On the same day this same class of stock sold on the New York Curb Exchange at a high of 59½ per share and a low of 56⅛ per share. The sales on that day on the New York Curb Exchange amounted to 900 shares.

On January 6, 1930, the petitioners sold shares of common stock of Insull Utility Investments, Inc., which they had acquired on December 31, 1929, by exercising the option contained in the agreement of January 17, 1929, as follows: Samuel Insull, 42,816 shares for $1,712,640; Margaret A. Insull, 6,923 shares for $276,920; and Samuel Insull, Jr., 11,415 shares for $449,100.

In filing their Federal income tax returns for 1930, the petitioners reported profits on the foregoing sales as follows:

| | |
|---|---:|
| Samuel Insull | $1,079,891.24 |
| Margaret A. Insull | 174,609.66 |
| Samuel Insull, Jr | 280,550.81 |

The petitioners treated these amounts as capital net gain, while the respondent in determining the deficiencies held that they should be taxed as ordinary gains or profits.

On July 30, 1930, Insull Utility Investments, Inc., issued rights to its common and preferred stockholders of record on August 30, 1930, to subscribe for its common stock at $50 per share on and prior to September 15, 1930. In accordance with this action the petitioners herein received rights on stock held by them as follows:

| | |
|---|---:|
| Samuel Insull | 440,568¹⁴⁶⁄₂₀₀ |
| Margaret A. Insull | 68,016 |
| Samuel Insull, Jr | 135,221 |

On September 13, 1930, the petitioners exchanged the rights so received by them for common stock of the Corporation Securities Co., which at that date had a value of $23 per share.

As a result of this exchange the petitioners received shares of Corporation Securities Co. common as follows:

| | |
|---|---:|
| Samuel Insull | 21,272 |
| Margaret A. Insull | 3,289 |
| Samuel Insull, Jr | 6,578 |

The petitioners reported the entire amounts so realized in their income tax returns. They regarded, however, a portion thereof as having been realized from the exchange of rights received on stock considered by them as capital assets and reported such amounts as capital gain, while the remainder was reported as ordinary gain. In his deficiency notice the respondent determined the amount so reported as capital gain by each of the petitioners to be excessive.

During the years 1929 and 1930 each of the petitioners made contributions for gifts to organizations falling within the provisions of section 23 (n) of the Revenue Act of 1928 as follows:

|  | 1929 | 1930 |
|---|---|---|
| Samuel Insull | $164,358.65 | $360,360.46 |
| Margaret A. Insull | 27,250.00 | |
| Samuel Insull, Jr | 31,854.17 | 48,354.81 |

In the determination of the deficiencies the respondent has excluded all capital gains from the income upon which the limitation of 15 percent for the deduction of charitable contributions is based.

1. One of the issues in these proceedings is whether capital net gains realized by each of the petitioners in 1929 and 1930 should be excluded from net income in computing the 15 percent deduction allowable as charitable contributions under section 23 (n) of the Revenue Act of 1928. This issue is decided in favor of the petitioners, upon the authority of *Helvering* v. *Bliss*, 293 U. S. 144.

2. Although the respondent, in the computation of the deficiencies for 1929, held that the transaction by which the three petitioners and a fourth individual, Martin J. Insull, in January 1929 exchanged certain securities for shares of stock of Insull Utility Investments, Inc., was a nontaxable exchange, he now contends that he was in error in so doing and that the transaction should be treated as a taxable exchange and that the deficiencies for the year 1929 should be increased accordingly.

Section 112 (b)(5) of the Revenue Act of 1928 reads as follows:

(b) *Exchanges solely in kind.—*

\*         \*         \*         \*         \*         \*         \*

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

Section 112 (j) of the same act provides:

(j) *Definition of control.—*As used in this section the term "control" means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

It is the respondent's contention that immediately after the exchange by the petitioners of securities for shares of capital stock

of Insull Utility Investments, Inc., the petitioners and Martin J. Insull were not in control of the newly organized corporation; that the plan of the organization of Insull Utility Investments, Inc., contemplated that the petitioners should contribute 57,000 shares of the common stock to Halsey, Stuart & Co., as an inducement to it to purchase from the newly organized corporation 60,000 shares of its prior preferred stock and $6,000,000 of its gold debentures; that after all of these steps had been taken the petitioners and their associate did not control Insull Utility Investments, Inc., since they did not own any of the prior preferred stock of that corporation.

It has been stipulated that prior to the organization of Insull Utility Investments, Inc., an informal agreement had been reached between the petitioners and H. L. Stuart that Halsey, Stuart & Co. should purchase certain gold debentures and the prior preferred stock issued by Insull Utility Investments, Inc., and that the petitioners and Martin J. Insull would contribute 57,000 shares of the common stock as consideration for the services of Halsey, Stuart & Co. Upon the basis of this stipulation the respondent contends that all of the steps contemplated in the exchange transaction were not completed until after Halsey, Stuart & Co. had acquired the debentures, the prior preferred stock, and the 57,000 shares of common stock.

Although the transactions above referred to were contemplated by the petitioners prior to the organization of Insull Utility Investments, Inc., it can not be said that they in any wise affected the exchange transaction by which the petitioners transferred securities to Insull Utility Investments, Inc., and received the issued preferred stock, first series, and all the common stock in exchange therefor. The petitioners received their shares of stock on January 11, 1929. The exchange transaction was completed on that date. The petitioners, with Martin J. Insull, were the owners of all of the issued capital stock of Insull Utility Investments, Inc.

On January 18, 1929, Insull Utility Investments, Inc., entered into a written contract with Halsey, Stuart & Co. for the purchase by the latter of $6,000,000 gold debentures and 60,000 shares of prior preferred stock. The agreement provided, "As a commission to the Purchaser the Company agrees to issue, or to cause to be issued and transferred to the Purchaser fifty-seven thousand (57,000) shares of the company's common stock without par value." The agreement further provided:

4. The obligations of the parties hereto are subject to the following:

(a) Approval by counsel for the Purchaser as to the form and legality of issue of said Debentures and said Stock;

(b) The qualification of the securities to be purchased under the Securities Law of the State of Illinois either by direct action of the State authorities or by listing upon a stock exchange and thereby excusing such approval;

(c) Delivery of and payment for said Debentures and Stock shall be made within ten (10) days of the date hereof.

From the above facts it is clear that the agreement by which Halsey, Stuart & Co. was to acquire the debentures and the prior preferred stock of Insull Utility Investments, Inc., was no part of the exchange transaction or contract by which the petitioners and Martin J. Insull transferred their shares of stock to Insull Utility Investments, Inc. Clearly, "immediately after the exchange" the transferors were in control of Insull Utility Investments, Inc., and remained in control of it until after January 18, 1929. What happened on and after that date has no bearing upon the question in issue. Our opinion in *Federal Grain Corporation,* 18 B. T. A. 242, is apposite. The facts in that case were that certain individuals transferred property to the Federal Grain Corporation on May 1, 1924, in exchange for its entire capital stock. Prior to the exchange these individuals entered into two agreements regarding the stock to be received. One was a trust agreement under which the stock was to be held in trust for a period of five years, and the second was an agreement to sell such stock at certain prices per share over a period of five years. In our opinion we said:

* * * In our opinion, there is no question that the transferors had ownership and control of the petitioner's capital stock for some period of time, even if only momentary, which the petitioner concedes would be sufficient to meet the provisions of the statute. The creation of the trusteeship transferred to Klein the legal title to the shares of stock and the transferors retained their equitable interests. Without already having had complete ownership, therefore, at some time no interest whatsoever could have been transferred to Klein by the transferors. They did have complete legal and equitable ownership within the meaning of the statute, although it may have been for only a short time. * * *

Our opinion in *Federal Grain Corporation, supra,* was cited with approval in *Evans Products Co.,* 29 B. T. A. 992, in which we said:

The question then is whether E. S. Evans remained in control of the petitioner immediately after the transfer of the property from E. S. Evans & Co. to it. It is not essential that Evans should retain control for any length of time. It is sufficient that he was momentarily in control. *Federal Grain Corp.,* 18 B. T. A. 242.

\* \* \* \* \* \* \*

In our opinion immediately after the transfer of the property of E. S. Evans & Co. to petitioner, E. S. Evans, who owned all the stock of the transferor, was in control of the petitioner, and the determination of the respondent in this respect is approved. (*Schmieg, Hungate & Kotzian, Inc.,* 27 B. T. A. 337.) *West Texas Refining & Development Co.,* 25 B. T. A. 1254, on which the petitioner relies, is not in point. There the corporations involved were parties to the reorganization.

This rule was adopted in *American Compress & Warehouse Co.* v. *Bender*, 70 Fed. (2d) 655, cited by the Board in *Ared Corporation*, 30 B. T. A. 1080. That case involved the interpretation of section 203 (b) (4) of the Revenue Act of 1924, which contains the same language as section 112 (b) (5) of the Revenue Act of 1928, herein involved. The court said:

* * * It is not material that at a time subsequent to the consummation of the exchange of property solely for corporate stock the transferor corporations ceased to be in control of the transferee corporation.

The contentions of the respondent upon this point are not sustained.

3. In exchange for the securities transferred to Insull Utility Investments, Inc., in January 1929, the petitioners received rights to purchase within a period of two years at $15 per share five additional shares of common stock for each share of preferred stock owned by them. It is stipulated that these rights " had no value at the time received by the said petitioners." The rights became very valuable, however, prior to the close of 1929, and a portion of such rights owned by Samuel Insull, and all of the rights owned by Margaret A. Insull and Samuel Insull, Jr., were exercised on December 31, 1929, by the purchase of common stock at $15 per share. Six days thereafter, or on January 6, 1930, a portion of the stock thus acquired was sold at great profit. The only contention of the petitioners upon this point is that these profits are taxable at capital net gain rates. They were so returned by the petitioners. The capital net gain from this source reported by Samuel Insull was $1,079,891.24, by Margaret A. Insull, $174,609.66, and by Samuel Insull, Jr., $280,550.81. These profits were computed after making a slight adjustment in the basis for a stock dividend declared on December 17, 1929, and payable January 15, 1930. The correct amounts of the profits based upon the cost to the petitioners ($15 per share) were $1,070,400, $173,075, and $277,-875, respectively.

Section 101 of the Revenue Act of 1928 deals with capital net gains and losses. It defines a " capital gain " as the taxable profit realized from the sale or exchange of capital assets. It then defines " capital assets " in subsection (c) (8), in so far as here material, as follows:

(8) " Capital assets " means property held by the taxpayer for more than two years (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale in the course of his trade or business. For the purposes of this definition—

(A) In determining the period for which the taxpayer has held property received on an exchange there shall be included the period for which he held the property exchanged, if under the provisions of section 113, the property

received has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property exchanged.

It is the contention of the petitioners that, inasmuch as the shares of stock sold on January 6, 1930, were acquired through the exercise of rights issued on stock owned and held by them for a period of more than two years, they are entitled to return the profits realized from the sale of such stock as capital net gains. No support for such a contention can be found in the law. With respect to stock subscription rights the Supreme Court stated in *Miles* v. *Safe Deposit & Trust Co. of Baltimore*, 259 U. S. 247:

> * * * It is evident, we think, that such a distribution [stock subscription rights] in and of itself constituted no division of any part of the accumulated profits or surplus of the company, or even of its capital; it was in effect an opportunity given to stockholders to share in contributing additional capital, not to participate in distribution. * * * This privilege of itself was not a fruit of stock ownership in the nature of a profit; nor was it a division of any part of the assets of the company.

It is clear that if the petitioners had not exercised their rights and purchased additional shares of stock they would not have had the profits which accrued to them from the sale of those shares on January 6, 1930. Those profits resulted from an investment on December 31, 1929, of additional capital in the stock of Insull Utility Investments, Inc. The shares were held by the petitioners for a period of only six days. Since they were held for a period of less than two years they were not "capital assets" within the meaning of section 101 (c) (8) of the Revenue Act of 1928 above quoted. The gains were therefore not capital net gains. *Rodman E. Griscom*, 22 B. T. A. 979; *Ellen Ayer Wood*, 29 B. T. A. 1050.

In *Helvering* v. *New York Trust Co.*, 292 U. S. 455, the Supreme Court had before it the question whether donated property held by the donee for a period of less than two years was taxable as capital net gain where the time within which the donor and the donee held the property was more than two years. The Court held that the two periods should be added together for the purpose of determining the period during which it was held by the "taxpayer." From a careful consideration of that opinion and of the legislative history of the taxing statutes involving capital net gains and losses set forth therein, we find nothing which would warrant a modification of the principles invoked by the Board in *Rodman E. Griscom*, *supra*, and *Ellen Ayer Wood*, *supra*.

The contentions of the petitioners upon this point are not sustained. It should be noted, however, that the profits returned by the petitioners from the sales were in excess of the true profits, which

were, in the case of Samuel Insull, $1,070,400; in the case of Margaret A. Insull, $173,075; and in the case of Samuel Insull, Jr., $277,875. In the recomputations under Rule 50 the deficiencies should be recomputed upon the basis that the taxable profits from the sales on January 6, 1930, were as above stated.

4. On July 30, 1930, Insull Utility Investments, Inc., issued rights to its common and preferred stockholders of record on August 30, 1930, to subscribe for additional shares of common stock at $50 per share. The petitioners never exercised those rights to subscribe. They did, however, on September 13, 1930, exchange those rights for shares of common capital stock of the Corporation Securities Co., which at the time received had a value of $23 per share. The stock was valued by the petitioners in the computation of taxable gains from this source at $25 per share. The amounts returned by Samuel Insull, Margaret A. Insull, and Samuel Insull, Jr., were $533,524.09, $82,502.73, and $164,984.43, respectively. Small portions of these amounts were returned as taxable as ordinary income and the balance as taxable at capital net gain rates. In the audit of the returns the respondent determined the incomes of the petitioners from this source as follows:

|  | Capital net gain | Ordinary income |
| --- | --- | --- |
| Samuel Insull | $399, 817. 94 | $91, 162. 15 |
| Margaret A. Insull | 61, 499. 03 | 14, 425. 70 |
| Samuel Insull, Jr | 122, 979. 53 | 28, 848. 90 |

The respondent by amended answers alleges that he erred in determining that a portion of the gains was taxable at capital net gain rates and that the entire amounts should be taxed as ordinary income.

On brief, the petitioners state:

In the returns filed the petitioners reported as income the entire amount realized from the sale of rights received in 1930 on stock of Insull Utility Investments, Inc. to subscribe for additional common stock. No attempt was made to apportion a part of the cost basis of the stock on which such rights were issued for the reason that under the respondent's rulings then in existence practically all of such profit was taxable as capital net gain and little benefit would have resulted from such an apportionment. However, since the returns were filed the respondent has changed his rulings with respect to capital net gains, with the result that a large portion of the capital gain reported is now taxable as ordinary gain or profit.

The contention of the petitioners that they are entitled to allocate or apportion to the rights sold in 1930 a portion of the cost of stock on which such rights were issued is apparently predicated on article 58 of Regulations 74, which provides in part:

(1) If the shareholder does not exercise, but sells his rights to subscribe, the cost or other basis of the stock in respect of which the rights are issued shall be apportioned between the rights and the stock in proportion to the respective values thereof at the time the rights are issued, and the basis for determining gain or loss from the sale of a right on one hand or a share of stock on the other will be the quotient of the cost or other basis assigned to the rights or the stock, divided, as the case may be, by the number of rights issued or by the number of shares held.

Manifestly, under this regulation the petitioners would be entitled to the allocation referred to in the regulation, provided the rights had a value at the time they were issued, viz., August 30, 1930. The stipulated facts, however, contain no information upon this point. We can not, from the record, determine that any allocation should be made. The contention of the petitioners upon this point is therefore denied for lack of evidence.

The claim of the respondent that he erred in taxing a portion of the gain realized by the petitioners from the sale or exchange of the rights at capital net gain rates is sustained. The rights were held by the petitioners for less than a month from the date of issuance. They did not constitute " capital assets " within the meaning of the statute. *Rodman E. Griscom, supra; Ellen Ayer Wood, supra.* The motion for increased deficiencies in the correction of the errors is allowed.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

GOODRICH dissents.

ARUNDELL, VAN FOSSAN, and McMAHON dissent on the second point.