*118 OPINION.
Smith :
The first question to be considered is the basis to be used in the determination of the amortization allowance for patents for the year 1930. The respondent contends that this basis is the same as would be available to the predecessor owner, the Hazeltine Research Corporation, if it had not transferred them to the petitioner, for, he argues, in its income tax return for 1924 the Hazel-tine Research Corporation treated the transfer which was made in that year as one under the reorganization provisions of the Revenue Act of 1924, and the Research Corporation accounted for no taxable profit arising from the transfer of its patents to the petitioner for that year. The respondent has proved by an exhibit of the return of the Research Corporation for 1924 that it included in its gross income only amounts received from the sale of the Hazel-tine Corporation stock acquired by it on the deal.
Section 113 of the Revenue Act of 1928 provides in part:
(a) Property acquires, after February 28, 1913. — The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except that—
The only exceptions necessary to consider are subdivisions (7) and (8), which are as follows:
(7) TRANSFERS TO CORPORATION WHERE CONTROL OF PROPERTY REMAINS IN SAME persons. — If the property was acquired after December 31, 1917, by a corporation in cownection with a reorganisation, miS immediately after the transfer an interest or control in such property of 80 per centum or more remained in the same persons or any of them, then the basis shall be the same as it would be in the hands if the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. * * *
(8) Same — Corporation controlled by transferor. — If the property was acquired after December 31, 1920, by a corporation by the issuance of its stock or securities im, connection with a transaction described in section 112 (b) (5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. [Emphasis supplied.]
Section 112 (b) (5) provides:
(5) Transfer to corporation controlled by transferor. — No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are im, control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. [Emphasis supplied.]
*119 The term “ control ” is defined in section 112 (j) of the Revenue Act of 1928 as follows:
As used in this section the term “ control ” means the ownership of at least 80 per centum of the voting- stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.
In this proceeding the petitioner contends that after the contract of February 2, 1924, was performed, the Research Corporation owned only approximately 12 percent pf the outstanding stock of the petitioner corporation; that it never was contemplated that the Research Corporation should have any substantial interest in the petitioner corporation. We think this is clear from the testimony of Louis A. Hazeltine. The transcript of his testimony upon this point is as follows:
Q. Did you request Mr. Taylor to enlist the aid of some concern in setting up a situation to handle these things and acquire an interest in these inventions?
A. It was not so much in the nature of a request, but I told him I would be glad to capitalize the situation, and then if I remember correctly, a short time after that Mr. McConnell and his associates were interested in the matter.
Q. Let me ask you this: Was it your purpose in doing that to retain control of these patents?
A. Absolutely not. The purpose was to get out of the commercial field, and realize what I could on my own work, and to relieve myself of the troubles incident to the business and to commercial organizations in regard thereto.
Under the contract of February 2, 1924, the Hazeltine Research Corporation was to dispose of the patents and other assets which were transferred to the petitioner by it for 155,250 shares of stock of the petitioner and the Research Corporation was immediately to transfer 135,000 shares of such stock to Foster, McConnell & Co. for $650,000 cash. The contract was carried out according to its terms. Looked at as a whole, we think that it can not be said that “ immediate,ly after the transfer an interest or control ” of 80 per centum or more of the petitioner’s capital stock remained in the Research Corporation. The transaction must be so viewed. Cf. West Texas Refining & Development Co. v. Commissioner, 68 Fed. (2d) 77.
The facts in this case are substantially different from those which obtained in Samuel Insull, Jr., 32 B. T. A. 47, in which we held that where the petitioners exchanged certain securities for shares of stock of Insull Utility Investments, Inc., the Insulls were in control of the corporation immediately after the transfer. There the disposition of the shares of stock of Insull Utility Investments, Inc., soon after acquisition by the Insulls, was the result of an independent contract, and not, as here, in fulfillment of the contract which gave rise to the new corporation. See Hazeltine Corporation, 32 B. T. A. 4.
*120 We are of opinion that under section 113 (a) of the Revenue Act of 1928 the “ basis ” for determining the claimed deductions for exhaustion and obsolescence of patents is the “ cost ” to the petitioner of the assets acquired under the contract.
What was the cost to the petitioner of the assets acquired from the Research Corporation and from Taylor in February 1924? The petitioner contends that such cost was the fair market value of the assets transferred to the petitioner and that such value was $3,500,-000, the value placed upon them by the board of directors of the petitioner in February 1924. The respondent, on the other' hand, contends that the cost was the fair market value of the shares .o.f stock issued by petitioner in exchange for those assets and that such fair market value was $4.81 per share, the price at which the Research Corporation sold to Foster, McConnell & Co. 135,000 shares of stock. The respondent submits that the fair market value of all the assets transferred is $817,700, computed as follows:
Consideration_$650,000_ Shares of stock sold- 135,000
Shares issued for patents, trade-marks, contracts,' good will, etc_ 170,000x$4.81=$817,700
We are of the opinion that the respondent’s method of determining the value of the assets acquired by the petitioner from the Hazel-tine Research Corporation is not a correct method to be applied in this case. In Seymour Manufacturing Co., 19 B. T. A. 1280, 1285, we said: “ The cost of property acquired for stock is the £ fair market value’ of the stock.” To the same effect see Ambassador Petroleum Co., 28 B. T. A. 868. In this proceeding we note that Foster, McConnell & Co. paid $10 per share for 5,000 shares o.f stock purchased from the petitioner. It further appears that Foster, McConnell & Co. was able immediately to sell approximately all of the 135,000 shares of stock which it had acquired from the Hazeltine Research Corporation at approximately $10 per share. We think that this is the fair market value of the stock as of February 19, 1924, the date when the Hazeltine Research Corporation transferred its assets relating to the neutrodyne inventions to the petitioner. We therefore have found the cost of the total assets acquired by the petitioner from Hazeltine Research Corporation and from Taylor to have’ been $1,700,000.
We have also determined from a consideration of all of the evidence that the fair market value of the exhaustible assets acquired by the petitioner upon the issuance of 170,000 shares of stock was $1,275,000.
Our next question relates to the rate of exhaustion applicable to the cost of the exhaustible assets. The general rule with regard to the exhaustion of the value or cost of a patent application or inven *121 tion on a given basic date is that such value or cost is to be written off over a 17-year period dating from the issuance of the patent, unless obsolescence becomes a factor prior to the end of the 17-year period. Hershey Manufacturing Co., 14 B. T. A. 867; affd., 43 Fed. (2d) 298; Tennessee Fibre Co., 15 B. T. A. 133. Where the cost or value relates to an entire group of patents, patent applications and inventions, as is the situation here, exhaustion is allowed either over the average life of the patents, as in Prophylactic Brush Co., 25 B. T. A. 676, 686, or upon the life of the principal patent, as in Hyatt Roller Bearing Co. v. United States, 43 Fed. (2d) 1008, 1013; Individual Towel & Cabinet Service Co., 5 B. T. A. 158; and Hartford-Fairmont Co., 12 B. T. A. 98.
The petitioner contended that owing to the nature of the radio patents acquired by it, the rapid development in the radio art, and the many new devices that were being invented, the average useful life of the group of patents was not more than five years or, at the most, eight years. It introduced the testimony of numerous witnesses to the effect that the cost of the assets acquired should be amortized over an eight-year life.
The evidence further indicates that in 1929 or 1930 the Hazeltine neutrodyne patents lost much of their value by reason of a more general use of the screen grid tube in radio receiving instruments. It appears, however, that even though the value of some of the patents was greatly lessened in 1929 and 1930, the patents were not obsolete. The petitioner continued to receive some royalties upon the neutrodyne patents even after 1930. The record does not show upon just which patents royalties were received after 1930. The amount of royalties received in 1931 was $584,973.90 and in 1932, $382,797.18. The petitioner’s licensees had the authority to use many different patents owned by the petitioner. Some of the neutrodyne patents were used in connection with other and later patents taken out.
Upon a careful consideration of the entire record we are of the opinion that the petitioner is entitled to deduct from its gross income for the year 1930, one seventeenth of the basis hereinbefore indicated for the exhaustible assets acquired from the Eesearch Corporation and from Taylor. We conclude that the petitioner was entitled to deduct from its gross income for 1930, $75,000 representing depreciation of the exhaustible assets acquired from the Hazeltine Eesearch Corporation and from Taylor. In its notice of deficiency the respondent has determined that the petitioner was entitled to deduct from the gross income of 1930, $4,829.95 representing an amount for the “ amortization of patents purchased for cash.” This amount is in addition to the $75,000 representing the amortization of exhaustible assets acquired from the Hazeltine Eesearch Corpora *122 tion and from Taylor. Therefore, the total depreciation deduction to which the petitioner is entitled for 1930 is $79,829.95.
In its income tax return for 1930 the petitioner deducted from gross income the following items: patent applications, $41,363.92; patent interferences, $36,681.26. These amounts were disallowed by the respondent in a computation of the deficiency. In its brief upon this point the petitioner states:
By contract, inventions made by engineers of the laboratory and research department of petitioner were assigned to petitioner. The retained attorneys for the company applied for patents on these. There were numerous cases, the service's were rendered simultaneously and charges lumped without segregation. Some of these applications ripened into patents, others were disallowed, others went into interference. The charges were all lumped and paid monthly as the services were rendered. .
There was no practical way to allocate each charge to each pending application. To require this would be to deny to petitioner this expense in its entirety and capitalize it.
This Board has held in numerous cases that the cost of developing patents, secret processes, etc., are capital expenditures and that the taxpayer has no option to treat such costs as deductible expenses. Gilliam Manufacturing Co., 1 B. T. A. 967; Goodell-Pratt Co., 3 B. T. A. 30; Beaumont Co., 3 B. T. A. 822.
The contention of the petitioner that the items referred to above constitute legal deductions from gross income as ordinary and necessary expenses is not sustained.
The petitioner offered no evidence with respect to the disallowance by the respondent of the deduction from gross income of $55,000 representing a reserve for bad debts. Neither is that item referred to in the briefs. For lack of evidence showing any error on the part of the respondent in disallowing this deduction the claim of the petitioner to the deduction is not sustained.
Reviewed by the Board.

Judgment will be entered under Rule 50.