The Strouse, Adler Co. v. Commissioner.
Strouse, Adler Co. v. Commissioner
Docket No. 110962.
United States Tax Court
1944 Tax Ct. Memo LEXIS 198; 3 T.C.M. (CCH) 641; T.C.M. (RIA) 44219; June 19, 1944
*198 Brien McMahon, Esq., 821 15th St., N. W. Washington, D.C., and Harold Stickler, Esq., 208 S. La Salle St., Chicago, Ill., for the petitioner. Melvin L. Sears, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioner's income and declared value excess profits taxes for the fiscal years indicated below in the following amounts: Fiscal year ended November 30, 1938.
Income tax
$6,113.64
Declared value excess profits tax
1,389.29
Fiscal year ended November 30, 1939.
Income tax
6,169.00
Declared value excess profits tax
2,445.35
A 5 percent penalty for delinquency was also asserted against petitioner with respect to the year ended November 30, 1938, in the amount of $375.14. One of the issues originally raised relating to the deductibility of an addition of $1,000 to reserve for cash discount, has been specifically abandoned by petitioner, and another issue, with respect to a deduction of $664.86 representing an understatement of insurance expense resulting from mathematical error in calculation, has been settled by stipulation in favor of the petitioner's contention. Petitioner does not contest *199 the validity of the penalty assessed. The issues remaining for our decision are: 1. Was the transaction by which the assets of Strouse, Adler & Company, a partnership, were transferred to the petitioner corporation on December 10, 1927, a taxable or a non-taxable transfer? This is necessary to a determination of the question whether respondent erred in disallowing certain claimed deductions for depreciation. 2. Did the respondent err in disallowing a deduction of $5,500 for the fiscal year ended November 30, 1939, as a reserve for contingencies on foreign accounts receivable? 3. Did respondent err in disallowing a deduction of $1,000 added to a reserve against a balance of $1,000 due from an employee of petitioner who had received advances against earned commissions? 4. Did respondent err in failing to exclude from petitioner's taxable income, for the fiscal year ended November 30, 1939, the amount of $783.59 representing bad-debt recoveries charged off in previous years? Findings of Fact The facts herein were quite substantially stipulated, and as many of them together with facts found elsewhere from the record as are necessary to an orderly presentation of the case are set *200 forth here. Petitioner is a Connecticut corporation, with its principal place of business in New Haven. It filed its tax returns on an accrual basis for the years here in question with the collector of internal revenue for the district of Connecticut. The petitioner corporation was organized in 1927, and acquired the assets of a partnership known as "Strouse, Adler & Company", which had been engaged since 1851 in the manufacture first of hoopskirts and bustles, and later of corsets, corset stays, and paper boxes. Prior to November 1, 1927, the partnership was composed of the following individuals, whose proportionate interests in the partnership assets and profits are set out below: Interest in
Interest in
Partnership
Partnership
Assets
Profits
Louis M. Ullman
52.4%
28%
Isaac M. Ullman
25.6%
50%
George Mayer
22%
22%
On November 1, 1927, as a result of his disagreement with the others as to the necessity of securing additional capital, Mayer sold half of his interest to Louis and half to Isaac Ullman, for a total consideration of $125,000, of which $62,500 was to be paid by each brother, $12,500 in cash and $50,000 in notes. The respective interests *201 of Louis and Isaac in the partnership assets were thereafter, and immediately prior to the incorporation of petitioner, as follows: Interest in
Interest in
Partnership
Partnership
Assets
Profits
Louis M. Ullman
63.4%
39%
Isaac M. Ullman
36.6%
61%
Some time in early November 1927, before the organization of petitioner, but after the decision to organize it and the general plan of organization had been determined upon, some of the salesmen connected with the company "subscribed" to some of the preferred stock in the corporation which, as they were informed, was soon to be organized to carry on the business. None of them at that time paid any part of the price of the stock, and none of the stock was issued until early in January of the following year. On November 29, 1927, Articles of Incorporation were executed by Isaac, Louis and Joseph Ullman, as "all of the incorporators", providing for a capitalization of $1,500,000, divided into 6,000 shares First Preferred stock, par value $100 per share; 3,000 shares Second Preferred stock, par value $100 per share; 6,000 shares of Common stock, par value $100 per share. Only the common stockholders had voting powers. *202 On December 10, 1927, subscriptions to the corporate stock of petitioner were executed as follows: Isaac M. Ullman
2,200
shares common stock
555
shares First Preferred
stock
1,110
shares Second Pre-
ferred stock
Louis M. Ullman
3,779
shares common stock
945
shares First Preferred
stock
1,890
shares Second Pre-
ferred stock
Joseph H. Ullman
1
share common stock
On the same day, these three subscribers, described as "all the subscribers to the capital stock" of the corporation, waived notice of meeting of the corporation and held their first meeting. They elected themselves directors, and considered a proposal signed by Isaac and Louis Ullman as follows: "We, the undersigned, co-partners as Strouse, Adler & Company, do hereby offer to exchange, transfer, assign and convey to your Company, for and in exchange for the number and classes of the shares of the capital stock of the Company, hereinafter more fully stated, and the assumption and payment by the Company of the hereinafter mentioned debts, obligations and liabilities, the business and assets of the copartnership of Strouse, Adler and Company, now conducted at Number 78 Olive Street, in the City *203 of New Haven, Connecticut, together with and including the real property, cash on hand and in banks, stock on hand and in process of manufacture, raw materials, machinery, tools, apparatus, factory and office furniture, fixtures and equipments, wagons, automobiles, horses, accounts and bills receivable, cash on hand, choses in action, patents, applications for patents, trade-marks, trade-names, - you to take over the business as a going concern; on condition, however, that you shall assume and pay all the co-partnership's debts, obligations and liabilities, liquidated and unliquidated, of every kind, including a mortgage of the principal amount of Thirty Thousand Dollars ($30,000#), and accrued interest of Six Hundred Twenty Five Dollars ( $625#), upon the real property; all debts, obligations and liabilities are more fully identified by the books and records of said co-partnership, as of the 10 day of December, 1927. If this proposal is accepted, the Company shall issue and deliver to us or our order the Company's capital stock, fully paid and non-assessable, as follows: 2220 shares of common stock, $222,000.
To Isaac M. Ullman
555 shares of first preferred stock, $55,500.
1110 shares of second preferred stock, $110,000.
3779 shares of common stock $377,900.
To Louis M. Ullman
945 shares of first preferred stock, $94,500.
1890 shares of second preferred stock, $189,000.
To Joseph H. Ullman
1 share of common stock $100#.
*204 "Upon the issue and delivery to us, respectively, or to our order, of the shares of capital stock as aforesaid, we shall execute and deliver to the Company instruments of transfer and conveyance of the hereinbefore mentioned property, the real property to be conveyed by quit-claim deed. Acceptance of this offer shall constitute the Company's agreement to assume and pay the aforesaid debts, obligations and liabilities of the co-partnership." This proposal was accepted by a resolution in the following language: "WHEREAS, the fair and reasonable value of the business, property and assets mentioned in the aforesaid written proposal of Isaac M. Ullman and Louis M. Ullman is not less than One Million and Fifty Thousand Dollars ($1,050,000#), over and above the debts, liabilities and obligations therein mentioned to be assumed and paid by the Company, and said business, property and assets are necessary for the business of the Company. "RESOLVED, that said offer and proposal be, and the same hereby is, accepted and that the Board of Directors be, and they hereby are, requested, authorized and empowered to accept said offer, and to receive and accept the necessary instruments of transfer *205 and conveyance to carry out said written offer; and in full payment of the said business, property and assets to issue and deliver to Isaac M. Ullman and Louis M. Ullman, or to their order, the number and classes of shares of capital stock of the Company set out in said written offer; the Company, however, to assume and pay, and hereby agrees to assume and pay, the debts, obligations and liabilities mentioned in said written offer; "RESOLVED, FURTHER, that the Board of Directors of the Company be and they hereby are authorized and empowered to receive and accept the transfer and conveyance of the said business, property and assets in full and final payment and satisfaction of the entire and total subscriptions to the capital stock of the Company heretofore made by Isaac M. Ullman, Louis M. Ullman and Joseph H. Ullman." On the same date the directors held their first meeting, pursuant to a waiver of notice, and accepted the proposal which had already been accepted by them as stockholders. On December 12, 1927, a "Certificate of Organization" which had been executed by the three Ullman brothers, as directors, was filed. In it Isaac, Louis and Joseph, are described as "the original *206 subscribers" to stock, in the amounts there set out. This completed the organization of the corporation. Some time prior to petitioner's incorporation, and during the negotiations immediately preceding it, Isaac Ullman insisted that he be given sufficient stock in the contemplated corporation to assure his receiving a share of the profits comparable to the share of the partnership profits which he had been receiving. Louis agreed to transfer to Isaac, from the stock which he was to receive, a number of shares which would, in general, accomplish the desired result. On December 19, 1927, Louis did assign to Isaac 1,440 shares of his common stock. Later, on December 24, 1927, Louis assigned 160, 190 and 100 shares of his first preferred stock to Max B. Leichter, Blanche W. Leichter and Rose Osterweis, respectively, in payment of debts which he owed to them. On December 10, 1927, Isaac M. Ullman and Louis M. Ullman owned all the issued and outstanding stock of petitioner, with the exception of the one qualifying share held by Joseph. The amount of stock received by each of them bore the following proportionate relationship to their ownership of the partnership assets prior to the transfer: *207 Isaac
Louis
Total stock
% int. in
% int. in
authorized for
Partnership
Partnership
issuance
Shs.
Percent
assets
Shs.
Percent
assets
Common
6,000
2,220
37
3,779
62.98
1st Preferred
1,500
555
37
36.6
945
63   63.4
2nd Preferred
3,000
1,110
37
1,890
63   On December 24, 1927, pursuant to waivers of notice thereof, meetings of the stockholders and directors were held, and the directors were authorized by Isaac, Louis and Joseph Ullman, as "all of the stockholders", to issue, from time to time, such shares of the unissued authorized stock as they should see fit to issue. Thereafter beginning January 3, 1928, a total of 2,081 shares of first preferred stock was issued to various purchasers thereof, aside from the Ullman Brothers, for which a total of $208,100 was received. One such payment was made December 20, 1927, before the directors were authorized to issue the stock, but all the other payments were received beginning December 31, 1927, and ending October 31, 1928. The last of the stock so sold was issued March 6, 1928, and all the payments except four had been received by that date. Issue No. *208 2. In the fiscal year ended November 30, 1939, petitioner had certain open accounts receivable with debtors in Holland, Sweden, Finland, Palestine, Norway and Switzerland, aggregating $7,826.26. Due to the threatened involvement of said countries in the war in Europe and the Middle East, the petitioner set up a reserve against said accounts in the amount of $5,500. Petitioner deducted that amount in its tax return for that year. However, during the next fiscal year, practically all such accounts were collected, with the exception of a small amount which could be charged off against an existing reserve for bad debts export. Issue No. 3. In the fiscal year ended November 30, 1939, petitioner charged off an amount of $1,109.85 paid to a salesman named Albert Levy as advances against earned commissions (the amount of which charge-off was allowed as a deduction and is not in dispute) leaving a balance of $1,000 still due from Albert Levy representing that part of the advances which were not so charged off. Against this balance of $1,000 a reserve of $1,000 was created in that fiscal year, reflecting the judgment of petitioner that it was not likely that Albert Levy would repay *209 the same in the future. Albert Levy left the employ of the company on or about March 21, 1941, never having repaid said amount. Issue No. 4. Petitioner recovered a total amount of $428.49 in the fiscal year ended November 30, 1939, which had previously been charged off and deducted as bad debts. Of that amount $69.40 was charged off in the fiscal year ended November 30, 1934; and $271.76 in the fiscal year ended November 30, 1937. In both of those years petitioner's income tax returns reflected large net losses, far in excess of the amount charged off. The remainder was charged off in 1938 and 1939, the years now in question, for which petitioner's income tax returns reported net losses. However, whether petitioner will be held to have sustained losses during those years will depend on the decision in Issue Number 1 herein. Petitioner has conceded and we find that respondent properly disallowed a deduction of $1,000 added by petitioner to a reserve for cash discounts, and that the imposition of the penalty for delinquent filing of the return for 1938 was justified. Respondent has conceded, and we find, that petitioner is entitled to an additional deduction for insurance expense *210 in the amount of $664.86. Opinion KERN, Judge: The first and principal issue is whether respondent was correct in disallowing certain depreciation items claimed by petitioner in its returns for 1938 and 1939. This depends on the basis of the depreciable property in the hands of petitioner, and this, in turn, depends on whether the transfer by which petitioner acquired the property in 1927 was taxable, as petitioner contends, so that its basis would be its cost, or non-taxable, as respondent claims, so that petitioner's basis would be the basis of the property in the hands of the transferors. The facts are extensively outlined in our findings. The statute applicable to the basic question is section 203(b)(4) and (i), Revenue Act of 1926: SEC. 203
* * * * *
(b)(4) No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially *211 in proportion to his interest in the property prior to the exchange. * * * * *
(i) As used in this section the term "control" means the ownership of at least 80 percentum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation. The property involved here was transferred to petitioner on December 10, 1927, by Isaac and Louis Ullman, who were partners in the operation of the business which petitioner was organized to take over. Immediately before the transfer, Isaac owned 36.6 percent of the partnership assets, and immediately after the transfer he owned 37 percent of all the stock issued. Immediately before the transfer Louis owned a 63.4 percent interest in the partnership assets, and immediately after the transfer he owned 63 percent of all the first and second preferred stock issued, and 62.98 percent of the common stock. One qualifying share of common stock was issued to a third brother who had not been a member of the partnership. The consideration for the transfer of the property was the issuance of the stock of petitioner, and the assumption by petitioner of the liabilities of the partnership. The stock *212 received by each of the two transferors was substantially in proportion to his interest in the property prior to the transfer. The contentions of the petitioner are these: Prior to the organization of the petitioner, certain salesmen of the predecessor partnership, and a former partner, subscribed to first preferred stock in the new corporation. However, no money was paid at that time, these subscribers did not participate in the organization of petitioner, but, on the contrary, the three Ullman brothers are designated as the sole subscribers to the capital stock; and no stock was issued to the outside subscribers until nearly two months after the incorporation of petitioner, when the directors authorized the sale of the stock, at which time these subscribers and others paid for the stock received by them. The stock which they received was a part of the first preferred stock, of which only one-half had theretofore been issued. It is the petitioner's view that the sale of this stock was an integral step in the transaction by which it acquired this property and that the persons having "control" of the new corporation immediately after the transfer, within the meaning of the statute, *213 are Isaac and Louis Ullman and the subscribers above referred to; and that because of the fact that the subscribers received only first preferred, while the Ullmans received some of each class of stock the situation does not meet the "proportionate" test set up by the statute. We are in disagreement with petitioner on the proposition of regarding the subscribers as participants in the plan of incorporation. The evidence does not support any assumption that these subscribers and the Ullman brothers were in any sense coplanners or promoters of the new corporation. The decision of the Ullmans to organize a corporation to take over the partnership business was sufficiently definite and determined upon by November 1, 1927, that the dissenting partner on that date withdrew from the business, selling his interest to the two remaining partners. One of the principal purposes of the change was to secure new capital, and to accomplish this, it was contemplated that some of the first preferred stock would be sold to outside investors. Thereafter, the first opportunity to acquire the stock was made available to employees of the partnership, some of whom indicated their desire to take advantage *214 of it. But they did not thereby become incorporators, nor do we think it was intended by any of the individuals involved that they should. The stock for which they were subscribing was not intended to be issued as part of the plan of organization. The directors did not authorize its issuance until several weeks after the incorporation of the petitioner. The money received, or to be received, for their stock, was not included in the amount of paid-in capital with which the corporation was to begin business, nor were their names included in the list of incorporators or subscribers of original stock. We are convinced that the only persons concerned with the transfer by which the petitioner acquired this property were Louis and Isaac Ullman. The transfer was complete and the corporate organization was finally established according to the plan of the incorporators by December 12, 1927. The sale of the remaining unissued stock was an independent transaction. It was undoubtedly one of the purposes of the incorporation of petitioner that stock should be sold to outside interests and new capital in that way be acquired for the business; but that purpose was indefinite and impersonal and it *215 can not be said that the plan of reorganization included the issuance of stock to any specific individual or person other than the Ullmans. With that decided, since Louis and Isaac Ullman owned all the voting stock (except one share) and all the outstanding non-voting stock, in the proper proportions, immediately after the transfer, this case falls squarely within the provisions of the statute. See Federal Grain Corporation, 18 B.T.A. 242, Samuel Insull, Jr., 32 B.T.A. 47. The second point advanced by petitioner has to do with an arrangement between Louis and Isaac Ullman, whereby Louis agreed to transfer to Isaac certain shares of his common stock. Under the unusual arrangement which had prevailed during the existence of the partnership, immediately prior to the organization of petitioner, Isaac, who owned only a 36.6 percent interest in the partnership assets, drew 61 percent of the profits, by agreement. Louis who owned 63.4 percent of the property, drew 39 percent of the profits. Thus, the sharing in profits was disproportionate to the proprietary interests of each partner. During the conferences leading up to *216 the incorporation of petitioner, in which it was contemplated that stock was to be issued to each in proportion to his ownership of partnership assets, Isaac insisted that he be given a share in the corporate profits proportionate to that which he had received from the partnership. Louis agreed to transfer at some indefinite future time "enough stock to compensate him [Isaac] for the difference between * * * what he would get for his stock, and the difference between what he drew from the company * * *." Some nine or ten days after the stock was issued to him, Louis assigned to Isaac a certificate for 1,440 shares. Obviously, the stock received by each of the transferor partners upon the organization of petitioner corporation was substantially in proportion to his proprietary interests in the property prior to the exchange, and later an arrangement was carried out whereby the stock was redistributed so that it was substantially in proportion to his interest in the profits from the property. Petitioner contends that this was a part of the "plan" of incorporation, which resulted in the ultimate receipt by the Ullmans of stock in amounts disproportionate to their respective interests *217 in the property before the transfer. We do not agree with this contention as applied to the extraordinary and unusual facts of the instant case. Here the partner owning a one-third interest in the partnership property was entitled to two-thirds of the partnership profit, and, conversely, the partner owning a two-thirds interest in the partnership property was entitled to only one-third of the partnership profit. It is apparent that when petitioner corporation was organized as the successor to the partnership business the two partners were endeavoring to work out an arrangement whereby their relative interests in the partnership would continue in its corporate successor in the same general proportions. They complied with the terms of the statute in question so far as their proprietary interests were concerned by taking stock of the transferee corporation in proportion to their proprietary interests. Thereafter, the stock was redistributed in an attempt to make the stock owned by each represent substantially the interest of each former partner in the income of the partnership business. The theory of the section of the statute quoted is that if the interests of the transferors are continued *218 without material change in the transferee corporation, no gain or loss will be recognized. Here the transferor partners were working out an arrangement whereby under the unusual circumstances their interests would be so continued. Under the peculiar facts of the instant case we are unable to come to the conclusion urged by petitioner, that the amount of stock received by each transferor was not substantially in proportion to his interest in the property prior to the exchange. We reach our decision the more readily because the transfer of stock from Louis to Isaac took place nine days after the transfer of their interests to petitioner corporation and was pursuant to an oral understanding between the two brothers which was indefinite as to method and time of execution, and which was no part of the formal plan of incorporation leading to the existence of petitioner. Petitioner also contends that the arrangement by which Louis assigned, on December 24, 1927, certain other certificates of stock to three individuals to whom he, personally, was indebted, resulted in subjecting the transfer by which he received the stock to taxation because it left Louis with less than his proportionate *219 share of the stock, and the total of the shares so transferred reduced the amount left in the hands of the Ullmans below the amount necessary for control. We must reject this theory in its entirety. Certainly the satisfaction of Louis' private debts by a later assignment of his stock is wholly unrelated to the transfer of property to the corporation in exchange for that stock. Even though he had agreed prior to his receipt of the stock, (and we do not know that he had) to transfer it at some later time, he none the less received that stock as consideration for his transfer of the property to the corporation. In fact he held it for nearly two months thereafter. His receipt of a proportionate share of the stock, and the control of the corporation by the Ullmans "immediately after the transfer" are not affected by any such wholly private arrangement. See Schmieg, Hungate & Kotzian, Inc., 27 B.T.A. 337. We conclude that the transfer by which the petitioner acquired this property in exchange for stock was complete by December 12, 1927, and immediately after the transfer the transferors were in control of the corporation, owning all of the issued stock except *220 one share of common stock; and that each received stock in an amount proportionate to his interest in the property prior to the exchange. The exchange was therefore non-taxable, and petitioner's basis for the property is that which it had in the hands of the transferors. With respect to Issue No. 2, petitioner offered no evidence beyond the stipulation which is substantially contained in our findings of fact. The reserve was designated a "reserve for contingencies", and its deduction was disallowed by respondent with the explanation that no statutory basis existed for the deduction. See Brown v. Helvering, 291 U.S. 193; Frmville Oil & Fertilizer Co., 30 B.T.A. 1048, affirmed 78 Fed. (2d) 83. If it was a reserve for bad debts, section 23(k)(1) authorizes the deduction of a reasonable addition to such a reserve, but only in the discretion of the Commissioner, which will not be lightly set aside. See Art Metal Construction Co. v. United States, 17 Fed. Supp. 854; Mertens Law of Federal Income Taxation, Sec. 30.78. The burden is on the petitioner to establish error *221 on the part of the respondent, and it has not met that responsibility. Issue No. 3. It was stipulated that during the fiscal year ended November 30, 1939, petitioner charged off an amount of $1,109.85 paid to a salesman named Albert Levy as advances against earned commissions. The amount of this charge-off is not in dispute. This action left a balance due from Levy of $1,000. Against that balance a reserve of $1,000 was set up, reflecting the judgment of petitioner that it was unlikely that Levy would pay the amount so due from him. Levy left the employ of petitioner in March 1941, without having paid the same. Petitioner relied on the stipulation and offered no other evidence or argument in support of this issue. Petitioner is thus left in much the same position with respect to this issue as we found it with reference to Issue No. 2. It had the burden of establishing error on the part of respondent, which responsibility it made no effort to discharge. Respondent suggests there is no statutory basis for a deduction of additions to a reserve for contingencies of this kind, and we know of none. This is not a deduction of a bad debt. If a deduction is claimed as an addition to *222 a reserve for bad debts, it must be reasonable, as we have seen, in the Commissioner's discretion. Not only does petitioner make no showing as to these factors, but it makes no attempt to explain the admitted circumstance that the debtor here continued to work for petitioner for more than fifteen months after the close of the fiscal year, from which it might reasonably be assumed that some part of the debt could have been collected, if an effort had been made. We can not say that respondent erred. Issue No. 4. The resolution of this issue will be a matter of calculation. The parties do not seem to be in conflict on the proposition that there should be excluded from petitioner's income those amounts recovered by it during the taxable year on account of bad debts theretofore charged off and deducted, in whole or in part, to the extent to which those deductions did not result in a reduction of the petitioner's tax. See Dobson v. Commissioner, 320 U.S. 489. The major portion of the bad debts on which later recoveries were made, which are involved here, were deducted during 1938 and 1939, the tax years under consideration. Petitioner claims to have *223 sustained net losses during those years, while the respondent has determined petitioner had taxable income during those years, by reason of the adjustments which we have considered principally under Issue No. 1 herein. Having decided that issue in respondent's favor, it is probable that a recomputation will disclose that petitioner did have taxable income as a result of the bad debt recoveries, and the deductions claimed will not doubt have the effect of reducing petitioner's tax, so that a later recovery of some of those debts will not be excluded under section 22(b)(12). The exact extent of the income from that source to be included will be a matter of computation. The issues relating to the correctness of respondent's disallowance of a deduction of $1,000 added by petitioner to a reserve for cash discounts; and imposition of a 5 percent penalty for delinquency for 1938, and petitioner's right to an additional deduction of $664.86 for insurance expense, are all resolved by agreement of the parties, to which effect will be given in the computation to be made. Decision will be entered under Rule 50.